## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | |
| **Plaintiff,** | |
| **v.** | **Civil Action File No.** |
| **ELCHONON SCHWARTZ and NIGHTINGALE PROPERTIES, LLC,** | **JURY DEMAND** |
| **Defendants.** | |

## COMPLAINT

Plaintiff Securities and Exchange Commission ("Commission") alleges as follows:

## SUMMARY

1.      From May 2022 through March 2023 (the "Relevant Period"), Defendants Elchonon "Elie" Schwartz ("Schwartz") through his company, Nightingale Properties LLC ("Nightingale"), raised over $60 million from at least 700 retail investors in two separate offerings of commercial real estate investment opportunities.

2.      One offering related to the purchase of an office building in Atlanta (the "Atlanta Financial Center Offering"), which raised approximately $54 million.

3.    The other offering involved the recapitalization of a mixed-use building in Miami Beach (the "Miami Beach Offering"), which raised approximately $8.8 million.

4.    Defendants used a third-party provider's internet platform to solicit these investments.

5.    The online platform offered accredited investors the opportunity to invest in commercial real estate private placements.

6.    Defendants told investors that the money raised through the online platform from each offering would be placed in a segregated bank account.

7.     Defendants told investors that the invested funds would be used for the benefit of the specific investment only.

8.    Defendants also told investors that the invested funds would not be moved from the segregated bank account until Nightingale closed on each of the deals.

9.    These representations were important for investors when deciding whether to invest in both the Atlanta Financial Center Offering and the Miami Beach Offering.

10.    Contrary to these representations, Schwartz misappropriated at least $42 million of the $54 million that was raised from the Atlanta Financial Center Offering.

11.    Specifically, of the misappropriated Atlanta Financial Center funds, Schwartz used over $5 million to repay hard money lenders in unrelated borrowings.

12.    Schwartz also transferred over $12 million of the misappropriated Atlanta Financial Center funds to his brokerage accounts and used those funds to purchase First Republic Bank shares in March 2023.

13.    Schwartz also transferred over $16 million of the misappropriated Atlanta Financial Center funds to his personal accounts.

14.    Of that $16 million in misappropriated Atlanta Financial Center funds, Schwartz used more than $7 million to pay for a luxury condo that he was building in Miami.

15.    Additionally, contrary to the representations set forth in paragraphs 6-8 above, Schwartz misappropriated virtually all the $8.8 million that was raised in the Miami Beach Offering.

16.    Schwartz used funds misappropriated from the Miami Beach Offering to prop up other business ventures under Schwartz's management.

17.    Schwartz transferred over $4 million of the misappropriated Miami Beach funds to the Atlanta Financial Center accounts.

18.    While Schwartz did provide some investors refunds in the Atlanta Financial Center Offering, there are outstanding losses of $43.7 million and $8.8 million in the Atlanta and Miami Offerings, respectively.

## VIOLATIONS

19.     By the conduct described herein, Schwartz and Nightingale have engaged and, unless restrained and enjoined by this Court, will continue to engage in acts and practices that constitute and will constitute violations of Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)] and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 promulgated thereunder [17 C.F.R. § 240.10b-5].

## JURISDICTION AND VENUE

20.     The Commission brings this action pursuant to the authority conferred upon it by Sections 20(b) and 20(d) of the Securities Act [15 U.S.C. §§ 77t(b) and 77t(d)] and Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)].

21.     This Court has jurisdiction over this action pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27(a) of the Exchange Act [15 U.S.C. § 78aa(a)].

22.     In connection with the transactions, acts, practices, and courses of business described in this Complaint, Defendants, directly and indirectly, have made use of the means or instrumentalities of interstate commerce, of the mails, and/or of the means and instruments of transportation or communication in interstate commerce.

23.     Venue is proper in this district pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)], Section 27(a) of the Exchange Act [15 U.S.C. § 78aa(a)] and 28 U.S.C. § 1391 because Defendants offered and sold securities throughout the country, including in this district, and the Atlanta Financial Center property is in this district.

## FACTS

### Defendants

24.     **Elchonon ("Elie") Schwartz**, age 46, is a resident of New York City, New York.

25.     Schwartz founded and controls Nightingale Properties, LLC, a privately held commercial real estate investment firm.

26.     Schwartz does not hold any licenses and is not associated with any entity registered with the Commission.

27.     **Nightingale Properties, LLC** ("Nightingale") is a New York limited liability company with its principal place of business in New York City, New York.

28.     Nightingale is a privately held commercial real estate investment firm founded and, since November 2021, controlled entirely by Schwartz.

29.     Nightingale has never been registered with the Commission in any capacity.

**Related Entities**

30.    **The "Third-Party Provider"** is a Delaware limited liability company with its principal place of business in Austin, Texas.

31.    The Third-Party Provider operates an internet-based platform ("the Online Platform") that offers commercial real estate private placement investment opportunities to accredited retail investors pursuant to the Regulation D exemption from the registration requirements of Section 5 of the Securities Act.  The Third-Party Provider has never been registered with the Commission but does have two subsidiaries, a broker-dealer affiliate and an investment adviser, that are currently registered with the Commission

32.    **ONH AFC CS Investors LLC (the "Atlanta Financial Center LLC")** is a Delaware limited liability company formed in 2022 for the sole purpose of investing in a specific commercial real estate project in Atlanta, Georgia.  This entity and its securities have never been registered with the Commission.

33.    **ONH 1601 CS Investors LLC (the "Miami Beach LLC")** is a Delaware limited liability company formed in 2022 to invest in a specific commercial real estate project in Miami Beach, Florida.  This entity and its securities have never been registered with the Commission.

**Background**

34.    Schwartz, together with a partner, formed Nightingale, a privately held commercial real estate investment firm, in 2005.

35.    From 2005 until 2021, Schwartz oversaw the acquisition of properties for the Nightingale portfolio while his partner handled the property management side of Nightingale's business.

36.    In 2021, Schwartz's partner left Nightingale, leaving Schwartz in control of the entire enterprise.

37.    After his partner left, Schwartz exercised complete control over nearly every aspect of Nightingale's business dealings.

38.    Until 2023, Nightingale successfully engaged in dozens of commercial real estate transactions, either acquiring new properties or recapitalizing existing property investments.

39.    Nightingale financed its transactions through a combination of debt and equity.

40.    Until 2015, Nightingale financed the equity portion of its investments through a combination of its own capital and capital raised from friends and family of Schwartz.

41.    Beginning in 2015, Nightingale also began to raise capital for its deals from institutional investors.

42.    In April 2014, the Third-Party Provider launched the Online Platform to serve as an online investing vehicle where commercial real estate sponsors could connect with accredited retail real estate investors to raise capital via Rule 506(c) offerings.

43.    Because the Third-Party Provider did not have a registered broker-dealer affiliate until May 2022, it took the position that it could not take custody of investment funds.

44.    As a result, for the Nightingale offerings, investor funds were transferred directly from investors to a bank account controlled by Nightingale, with virtually no controls on the use of funds by either the Third-Party Provider or any other third party.

## Nightingale's Offerings on the Online Platform

### A. The Atlanta Financial Center Offering

45.    Schwartz was first introduced to representatives from the Third-Party Provider in November 2021 at an industry networking conference in Miami, Florida.

46.    Nightingale conducted its first offering on the Online Platform in January 2022, which raised $25 million for the purchase of an office building in Chicago.

47.     Shortly thereafter, in or around March 2022, Nightingale and the Third-Party Provider began the due diligence process for a second offering.

48.     The Atlanta Financial Center LLC was created as a real estate company whose sole purpose was to contribute equity, raised through the Third-Party Provider, to fund the purchase of the Atlanta Financial Center, a large commercial real estate complex in Atlanta, Georgia.

49.     In addition to capital raised through the Online Platform, the purchase of Atlanta Financial Center was to be funded by: (1) equity raised from other investors, (2) equity contributed from Nightingale or related entities, and (3) senior secured debt.

50.     At the time of the offering, the Atlanta Financial Center LLC was managed by One Night Holdings, LLC ("One Night"), a Nightingale affiliate controlled solely by Schwartz.

51.     Initially, Nightingale planned to raise $16 million through the Atlanta Financial Center Offering.

52.     On May 26, 2022, Nightingale launched the offering on the Online Platform where accredited investors could review offering materials, learn more about the Atlanta Financial Center, and complete their investment documents.

53.     All the Atlanta Financial Center offering materials and agreements were approved by Schwartz.

54.    Pursuant to the offering materials, individuals were offered the opportunity to invest funds which would then be pooled by Nightingale and used to fund the purchase of the Atlanta Financial Center.

55.    In return for their funds, investors would receive distributions from Nightingale based on the returns generated by the property.

56.    The subscription agreements provided for investor funds to be sent to Atlanta Financial Center LLC bank accounts controlled solely by Schwartz.

57.    Under Nightingale's agreement with the Third-Party Provider, the funds raised from investors were to be held by Nightingale in a segregated account until Nightingale closed on the Atlanta Financial Center building.

58.    The private placement memorandum for the Atlanta Financial Center Offering stated that "[t]he proceeds from this Offering will be used to purchase, lease, reposition, and extensively renovate" the property.

59.    The Subscription Agreements only allowed "[the Debtors to] use any proceeds from this Offering, net of any organizational and offering expenses, to fund through its direct or indirect subsidiaries [the property] … Managed by One Night Holdings LLC [One Night], a Delaware limited liability company."

60.    The Operating Agreements further provided that the Manager had a fiduciary duty to safeguard the funds and prohibit commingling or use of the money that did not benefit the Atlanta Financial Center project.

-10-

61.     These written representations were false and misleading.

62.     Rather than maintaining the proceeds from the offering in a segregated account and using those proceeds only to fund the project, Defendants knowingly misappropriated the funds.

63.     Nightingale was set to close on the Atlanta Financial Center property in the summer of 2022.

64.     For a variety of reasons shared with investors through the Third-Party Provider, the closing date kept moving further into 2022.

65.     Ultimately, the Atlanta Financial Center Offering accepted investor funds as late as February 2023.

66.     The Atlanta Financial Center Offering raised approximately $54 million from over 650 investors.

**B. The Miami Beach Offering**

67.     The Miami Beach LLC was created solely to recapitalize, with funds raised through the Online Platform, 1601 Lincoln Place, a mixed-use building in Miami Beach, Florida.

68.     1601 Lincoln Place was owned in part, and managed by, Nightingale and its affiliates prior to the Miami Beach Offering.

69.    It was previously fully occupied for two decades, but its major tenant vacated in early 2022, which presented an opportunity for a renovation and new potential major tenants.

70.    In addition to capital raised through the Online Platform, the recapitalization of 1601 Lincoln Place was to be funded by: (1) equity raised from other investors, (2) equity contributed from Nightingale or related entities, and (3) senior secured debt.

71.    At the time of the offering, the Miami Beach LLC was managed by One Night.

72.    On November 1, 2022, Nightingale launched the Miami Beach Offering on the Online Platform.

73.    Defendants hoped to raise $15 million in the Miami Beach Offering.

74.    Through the Online Platform, accredited investors could review offering materials for 1601 Lincoln Place and complete their investment documents.

75.    The offering materials and agreements for the Miami Beach Offering were like those in the Atlanta Financial Center Offering.

76.    All the offering materials and agreements for the Miami Beach Offering were approved by Schwartz.

77.    The offering materials and agreements for the Miami Beach Offering stated that the funds raised from investors were to be held in a segregated bank account controlled by Schwartz.

78.    The offering materials and agreements for the Miami Beach Offering also stated that investor funds were only to be used for the purpose of recapitalizing 1601 Lincoln Place property after closing.

79.    These written representations were false and misleading.

80.    Rather than maintaining the proceeds from the offering in a segregated account and using those proceeds only to fund the project, Defendants knowingly misappropriated the funds.

81.    The Miami Beach Offering accepted investments through March 2023, and raised $8.8 million from over 150 investors.

## C. The Atlanta Financial Center Offering and Miami Beach Offering Are Securities

82.    The investors in the Atlanta Financial Center and Miami Beach Offerings entered into investment contracts with Defendants.

83.    The investors provided principal investments totaling at least $62.8 million to Defendants.

84.    Defendants pooled investor funds.

85.    Defendants marketed their ability to successfully engage in commercial real estate transactions.

86.    Investors expected their profits to come from Defendants' continued ability to engage in successful commercial real estate transactions.

87.    Investors had no control over how Defendants operated the investments either under the written agreements or in actual ability,

88.    Investors relied entirely on Defendants to generate returns on their investments.

### D. Schwartz and Nightingale Misappropriate Atlanta Financial Center and Miami Beach Offerings' Investor Funds

89.    Investors solicited through the Third-Party Provider for the Atlanta Financial Center Offering began wiring their investment funds to the dedicated Nightingale bank account on June 6, 2022.

90.    Instead of keeping the funds in this account as represented, however, three days later, on June 9, Schwartz began to misappropriate investor funds.

91.    In total, Schwartz and through the actions of Schwartz, Nightingale, misappropriated at least $42 million of the $54 million that was raised in the Atlanta Financial Center Offering.

92.    Similarly, on November 14, 2022, investors solicited through the Third-Party Provider for the Miami Beach Offering began wiring their investment funds to the dedicated Nightingale bank account.

93.    Instead of keeping the funds in this account as represented, however, and while simultaneously misappropriating funds from the Atlanta Financial

Center offering, Schwartz and through the actions of Schwartz, Nightingale, immediately began to misappropriate investor funds.

94.    In total, Schwartz and Nightingale misappropriated virtually all the $8.8 million raised in the Miami Beach Offering.

95.    Schwartz and Nightingale used the misappropriated funds to prop up various other Nightingale properties that needed capital.

96.    Defendants sent $4 million from the Atlanta Financial Center Offering to cover expenses related to the Miami Beach Offering.

97.    Later, Defendants used $4 million from the Miami Beach Offering to fund investor refunds and other misappropriation of the Atlanta Financial Center funds.

98.    Schwartz used the money he misappropriated to fund his personal accounts with over $16 million.

99.    Schwartz used the misappropriated funds in his personal accounts to make over $7 million in payments directly toward construction of his penthouse condo.

100.    Schwartz also used the misappropriated funds in his personal accounts to cover payroll in his multiple business ventures.

101.    Additionally, Schwartz used the misappropriated funds to purchase high end watches, to pay his credit cards, and to pay other daily expenses, including cycling the funds back to his business accounts.

102.    Schwartz transferred over $12 million of investor funds in the span of a week in March 2023 to his brokerage accounts.

103.    Schwartz used the $12 million of misappropriated funds to purchase stock and options in various companies.

104.    Schwartz used $6.4 million of misappropriated funds to purchase stock and options in First Republic Bank, in an apparent attempt to bet on the bank when it was on the verge of collapse.

105.    Schwartz's use of investor funds to purchase stocks and options resulted in $10.7 million in losses before the end of April 2023.

### E. The Atlanta Financial Center Offering and Miami Beach Offering Fail to Close

106.   During the Atlanta Financial Center and Miami Beach Offerings, Nightingale's entire portfolio was facing dire economic challenges.

107.   At least five Nightingale portfolio properties were either in the process of being foreclosed upon or up for auction, and at least two others were not performing well.

108.   By May 31, 2023, neither the Atlanta Financial Center Offering nor the Miami Beach Offering had closed.

109.   In May 2023, the Third-Party Provider sent investors communications regarding the need to replace One Night as the manager over the Atlanta Financial Center LLC and the Miami Beach LLC.

110.   The communications explained that some investors were requesting refunds on their investments, but that Nightingale had not processed those refunds timely or consistently.

111.   The communications also stated that the Third-Party Provider had asked Nightingale to verify that funds were available to pay investors, but that Nightingale would not provide the Third-Party Provider with such verification.

112.   These communications stated that because Nightingale was unwilling to provide the requested verification, the Third-Party Provider proposed, and

Nightingale agreed, to the appointment of an independent manager over both the Atlanta Financial Center LLC and the Miami Beach LLC.

113.    The Third-Party Provider requested that the investors vote on the appointment of this independent manager to serve as a fiduciary on behalf of the investors and to manage the timely and orderly wind down of the entities.

114.    On June 7, 2023, the investors approved the appointment of an independent manager.

**F.  Bankruptcy Case and Current Status**

115.    On July 14, 2023, the newly elected independent manager of the Atlanta Financial Center LLC and Miami Beach LLC entities filed voluntary petitions for relief under Subchapter V of Chapter 11 of the Bankruptcy Code.

116.    Approximately three months later, the independent manager filed a Joint Plan of Liquidation that was approved.

117.    The Joint Plan is, in part, premised on a settlement with Schwartz and Nightingale that would, through the sale of substantially all their assets, pay investors from the Atlanta Financial Center and Miami Beach Offerings back in full.

118.    To date, only $3 million in payments have been made by Schwartz and Nightingale under this settlement.

## CONCLUSION

119.   As set forth above, Defendants engaged in a course of conduct designed to deceive investors, including by misappropriating investor funds.

120.   Defendants, in connection with and in the offer or sale of securities, knowingly made and disseminated material misrepresentations and materially misleading statements via written offering materials.

121.   Indeed, Schwartz and Nightingale misrepresented the use of funds and began to misappropriate offering proceeds as soon as they were raised, and misappropriated funds during the raise.

122.   As a result of the conduct described above, Defendants' investors suffered losses of $43.7 million in the Atlanta Offering and $8.8 million in the Miami Offering during the Relevant Period.

## COUNT I

### Violation of Section 17(a)(1) of the Securities Act
### [15 U.S.C. § 77q(a)(1)]

123.   The Commission realleges paragraphs 1 through 122 above.

124.   Between May 2022 and March 2023, Defendants, in the offer and sale of the securities described herein, by the use of means and instruments of transportation and communication in interstate commerce and by use of the mails, directly and indirectly, employed devices, schemes and artifices to defraud purchasers of such securities, all as more particularly described above.

125.   Defendants knowingly, intentionally, and/or recklessly engaged in the aforementioned devices, schemes and artifices to defraud.

126.   By reason of the foregoing, Defendants, directly and indirectly, have violated and, unless enjoined, will continue to violate Section 17(a)(1) of the Securities Act [15 U.S.C. § 77q(a)(1)].

## COUNT II

### Violations of Section 17(a)(2) and (a)(3) of the Securities Act
### [15 U.S.C. § 77q(a)(2) and (a)(3)]

127.   Paragraphs 1 through 122 are hereby realleged and are incorporated by reference.

128.   Between May 2022 and March 2023, Defendants, in the offer and sale of securities described herein, by use of means and instruments of transportation and communication in interstate commerce and by use of the mails, directly and indirectly:

> a.    obtained money and property by means of untrue statements of material fact and omissions to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

> b.    engaged in transactions, practices and courses of business which would and did operate as a fraud and deceit upon the purchasers of such securities, all as more particularly described above.

129.    Defendants, directly and indirectly, have violated and, unless enjoined, will continue to violate Sections 17(a)(2) and 17(a)(3) of the Securities Act [15 U.S.C. §§ 77q(a)(2) and 77q(a)(3)].

## COUNT III

**Violations of Section 10(b) and Rule 10b-5 of the Exchange Act**
**[15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5]**

130.    The Commission realleges paragraphs 1 through 122 above.

131.    Between May 2022 and March 2023, Defendants, in connection with the purchase and sale of securities described herein, by the use of the means and instrumentalities of interstate commerce and by use of the mails, directly and indirectly:

    a.    employed devices, schemes, and artifices to defraud;

    b.    made untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

    c.    engaged in acts, practices, and courses of business which would and did operate as a fraud and deceit upon the purchasers of such securities,

all as more particularly described above.

132.    Defendants knowingly, intentionally, and/or recklessly engaged in the aforementioned devices, schemes and artifices to defraud, made untrue statements of

material facts and omitted to state material facts, and engaged in fraudulent acts, practices and courses of business.

133.   By reason of the foregoing, Defendants, directly and indirectly, have violated and, unless enjoined, will continue to violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully prays for:

## I.

Permanent injunctions enjoining Defendants and their officers, agents, servants, employees, and attorneys from violating, directly or indirectly, Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## II.

A permanent injunction enjoining Defendant Schwartz from directly or indirectly, including, but not limited to, through any entity owned or controlled by him participating in the issuance, purchase, offer, or sale of any security, provided, however, that such injunction shall not prevent Defendant Schwartz from purchasing or selling securities for his own personal account.

**III.**

An order requiring an accounting by Defendants of the use of proceeds of the fraudulent conduct described in this Complaint and the disgorgement by Defendants of all ill-gotten gains or unjust enrichment with prejudgment interest, to effect the remedial purposes of the federal securities laws.

**IV.**

An order pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)] imposing civil penalties against Defendants.

**V.**

Such other and further relief as this Court may deem just, equitable, and appropriate in connection with the enforcement of the federal securities laws and for the protection of investors

**JURY TRIAL DEMAND**

The Commission hereby demands a trial by jury as to all issues that may be so tried.

Respectfully submitted this 12th day of February, 2025,

*/s/ Kristin W. Murnahan*
M. Graham Loomis
Regional Trial Counsel
United States Securities & Exchange Commission
950 E. Paces Ferry Road NE, Suite 900
Atlanta, GA 30326

-23-

404-842-7622
Georgia Bar No. 457868
loomism@sec.gov

Kristin W. Murnahan
Senior Trial Counsel
United States Securities & Exchange Commission
950 E. Paces Ferry Road NE, Suite 900
Atlanta, GA 30326
404-842-7655
Georgia Bar No. 759054
murnahank@sec.gov

COUNSEL FOR PLAINTIFF